## No. C-1039

**The Banking Board of the State of Colorado, Harry Bloom, State Bank Commissioner and their Successors in Office; Charles A. Schley, Harold Kountze, Jr., Kenneth H. Nordling, Will F. Nicholson, Jr. and Verner Eliason, as Applicants for Charter for the Proposed Colorado Bank-Tech Center v. Columbine State Bank; and Larry A. Mizel, Harry Guzofsky, Steven P. Levine, John Andrew Love and William B. Kemper, as Organizers of the Southeast State Bank**

(569 P.2d 871)

Decided September 19, 1977. Rehearing and motion to remand to Colorado Court of Appeals denied October 11, 1977.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, John R. Rodman, Assistant, for The Banking Board of the State of Colorado, Harry Bloom, State Bank

Commissioner and their Successors in Office.

Davis, Graham & Stubbs, Arthur E. Otten, Jr., for petitioners
Schley, Kountze, Nordling, Nicholson and Eliason.

Banta & Eason, P.C., successor professional corporation to Simon,
Eason, Hoyt & Malone, P.C., Richard L. Eason, for respondent Colum-
bine State Bank.

Rothgerber, Appel & Powers, A. Frank Vick, Jr., William P. John-
son, for respondents Larry A. Mizel, Harold Guzofsky, Steven P. Levine,
John Andrew Love, and William B. Kemper.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

We granted certiorari to answer the following questions:
(1) Does a stock subscription agreement conditioned upon the approval of
the board of governors of the federal reserve system satisfy the require-
ment of the Colorado Banking Code of 1957[1] that the stock of a proposed
commercial bank be "fully subscribed"?[2]
(2) Are the state banking board and state bank commissioner required to
determine, as a part of their chartering duties, that applicants for a com-
mercial bank charter have complied with the provisions of the federal
Bank Holding Company Act of 1956?[3]
We answer question one in the affirmative and question two in the
negative. In so doing, we reverse the decision of the court of appeals in
*Columbine State Bank v. Banking Board*, 38 Colo. App. 58, 554 P.2d
1355 (1976).
In February 1974, the individual petitioners, Charles A. Schley,
Harold Kountze, Jr., Kenneth H. Nordling, Will F. Nicholson, Jr., and
Verner Eliason, filed their application with the petitioner, the state bank
commissioner, for a new commercial bank to be located in the Denver
Technological Center. As required, the application listed the names of all
the shareholders. The principal stockholder in the proposed bank, Colo-
rado National Bankshares, Inc. (Bankshares) is a bank holding company

---

[1]Section 11-1-101, *et seq.*, as amended, C.R.S. 1973.
[2]Section 11-3-109(1), C.R.S. 1973.
[3]12 U.S.C. § 1841, *et seq.*

by virtue of the Bank Holding Company Act of 1956. The Act requires any bank holding company to obtain approval from the Federal Reserve System before actually acquiring stock in a bank. The petitioners stated in both their application and at the formal hearing that they would seek and obtain the requisite federal approval.

On October 31 and November 1, 1974, the banking board held a hearing on the application at which time Columbine State Bank and the organizers of Southeast State Bank, Larry Mizel, Harold Guzofsky, Steven P. Levine, John Andrew Love and William B. Kemper, respondents herein, appeared as protestants. They are competitors of the proposed new bank, each being located about two and one-half miles from the proposed new bank. Columbine presented no testimony whatsoever at the formal hearing. Southeast's only witness was its president, who testified that the new bank would make it more difficult for Southeast to attract banking business from the Denver Technological Center.

The banking board approved the banking commissioner's finding that the petitioners had complied with the statutory requirements. Sections 11-3-109 and 11-3-110, C.R.S. 1973.

"However, we feel that one of the Commissioner's findings, specifically, that the applicants have proceeded in a lawful manner, deserves comment because protestants have objected to that finding. The protestants have alleged the following: (1) that because a portion of the stock of the proposed bank has been subscribed by a bank holding company, the subscription is a conditional one and thus the requirement that the stock be fully subscribed has not been complied with; and (2) that since the Federal Reserve Board approval is necessary before a bank holding company can legally open the proposed bank, the granting of this charter results in an unlawful delegation of the Board's chartering authority to a federal agency. We disagree with both of the protestant's contentions and overrule their objections.

"The application shows that the names of all the subscribers were disclosed and that they unconditionally subscribed for all of the stock. Therefore, under our interpretation of the Banking Code, the stock was 'fully subscribed' at the time application for charter was made. The fact that federal regulatory approval must be obtained before the applicants can lawfully exercise their state charter and operate the bank, does not, in our opinion, amount to a delegation of our chartering authority to the Federal Reserve Board."

The banking board found that the new bank would serve a public need in the area of the Denver Technological Center and that the volume of business in the area was such that the profitable operation of the new bank could be reasonably projected. The board's approval was contingent on the new bank's satisfying all pre-chartering requirements, a bona fide application for membership in either the Federal Reserve System or the

Federal Deposit Insurance Corporation, and an increase in capitalization from $270,000 to $750,000.

The protestants, respondents herein, appealed the order to the court of appeals. The court of appeals set aside the order of the banking board, remanding the application to the board with directions to, in effect, deny the application.

The court of appeals held that if the subscriptions were conditional, they were not "fully subscribed" as required by section 11-3-109(1), C.R.S. 1973. That statute states that "[a]fter the capital stock has been *fully subscribed*, the incorporators shall make application to the commissioner for a charter." (emphasis added). Therefore, the board's order was in excess of its statutory authority. Section 11-2-105(2), C.R.S. 1973. Alternatively, if the banking board determined that the subscriptions were unconditional, then Bankshares was in violation of the Bank Holding Company Act.[4] Consequently, the board's finding that the petitioners had proceeded in a lawful manner, section 11-3-110(1)(a), C.R.S. 1973, was not supported by the evidence and was still in excess of its statutory authority.

I.

The dispute is over the term "fully subscribed." The respondents and the court of appeals interpret "fully" as totally and *unconditionally* subscribed; the petitioners interpret it as totally subscribed. We agree with the petitioners and the banking board.

The court of appeals' interpretation is illogical when the phrase is considered with reference to the purpose and in the context of the whole statute. *People ex rel. Dunbar v. Colo. Poly. College*, 184 Colo. 305, 520 P.2d 736 (1974). The statute makes a charter contingent upon the performance of many conditions: adequate capital structure, section 11-3-103, C.R.S. 1973; a bona fide *application* for membership either in the Federal Deposit Insurance Corporation or the Federal Reserve System, section 11-3-110(6), C.R.S. 1973; holding of the first organizational meeting, section 11-3-112(1), C.R.S. 1973; taking of the directors' oath, section 11-3-112(2); and verification that the bank is open for business within six months of the date the order for a charter was granted, section 11-3-110(6), C.R.S. 1973.

The main thrust of the statutory *pre-chartering* requirements is the identification of the organizers and those supplying capital to the proposed bank, their backgrounds and source of funds. *Academy Boulevard Bank v. Banking Board*, 30 Colo. App. 331, 492 P.2d 76 (1971). The use of the words "fully subscribed" is obviously intended to

---

[4] § 3(a), 12 U.S.C. § 1842(a) requires a bank holding company to obtain Federal Reserve Board approval before it takes any action that "causes a bank to become a subsidiary of a bank holding company" or before it "acquires" more than five percent of any "voting shares of any bank."

insure that the applicants account for one hundred percent of the sub-scribed stock. *Academy Boulevard Bank v. Banking Board, supra.*

There is nothing in the statutory language of section 11-3-109, 11-3-110 or 11-3-111 to indicate that "fully subscribed" means uncondi-tionally and irrevocably subscribed. Generally, a subscription to stock in a proposed corporation is inherently conditional on the corporation's being formed and, therefore, revocable. *See generally* Annot., 61 A.L.R. 1464.[5]

In comparing "fully subscribed" as used in section 11-3-109(1) with the language of section 11-3-111, C.R.S. 1973, it is apparent that "fully subscribed" does not mean unconditionally subscribed:

"After a charter has been granted, the directors may call for the *payment of the subscriptions in full* within thirty days from the date of the notice thereof. No share shall be issued until the par value and the pro rata por-tion of the paid-in surplus specified in the charter have been *paid in full in cash.*" (emphasis added).

The requirement that capitalization be paid in full before a bank may open for business has, for all intents and purposes, the effect of an irrevocable stock subscription. As the effect is similar, a requirement that the subscription be unconditional in order to entitle the petitioners to a hearing pursuant to section 11-3-110 would be superfluous. We will not impute a specific legislative intention to make stock subscriptions to pro-posed corporations unconditional and irrevocable for the duration of the *pre-chartering* process where the legislature has not spoken to that effect.

We hold, therefore, that "fully subscribed" does not mean un-conditionally subscribed.

II.

In their application, the petitioners have stated their intent to request approval of the Federal Reserve System pursuant to 12 U.S.C. § 1842(a) for Bankshares to acquire the stock of the proposed bank. The banking board is not required as a part of its *pre-chartering* duties to de-termine that the petitioners have obtained federal approval. *Academy Boulevard Bank v. Banking Board, supra; see also Goldy v. Crane,* 167 Colo. 44, 445 P.2d 212 (1968). State law does not prohibit a bank holding company from acquiring stock in a state bank. Acquisition of an existing bank by a bank holding company is *exclusively* within the juris-diction of the Federal Reserve Board.[6]

---

[5]In the Colorado Corporation Code, the legislature has specifically provided otherwise. Section 7-4-103(1), C.R.S. 1973, states:
"A *subscription for shares of a corporation to be organized shall be irrevocable for a period of six months,* unless otherwise provided by the terms of the subscription agreement or unless all of the subscribers consent to the revocation of such subscription." (emphasis added).

[6]Bank Holding Company Act of 1956, § 3(a), 12 U.S.C. § 1842(a); *see also Whitney National Bank v. Bank of New Orleans and Trust Co.,* 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965).

## III.

We also reject the other arguments made by protestants. The fact that the banking board had denied a previous application of the petitioners is not res judicata. That doctrine does not apply to administrative decisions. *Northern National Bank v. Banking Board*, 37 Colo. App. 135, 547 P.2d 253 (1975). The board's decision was not arbitrary or capricious. We will not disturb the board's decision, as there was sufficient evidence to support it, and because it was within their special field of expertise. *Goldy v. Henry*, 166 Colo. 401, 443 P.2d 994 (1968).

The opinion of the court of appeals is reversed.

MR. JUSTICE CARRIGAN does not participate.