In re the Matter of SUMMIT TRUST SER-VICES, INC., Upon the Petition of the Colorado State Banking Board, Petitioner–Appellee,

and

Concerning Law Offices of Bernard J. Hittner Money Purchase Plan and Law Offices of Bernard J. Hittner Profit Sharing Plan, Objectors–Appellants,

v.

Andrew C. SNYDER, Receiver, Movant–Appellee.

No. 96CA0200.

Colorado Court of Appeals, Div. III.

March 20, 1997.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Richard H. Forman, Senior Assistant Attorney General, Denver, for Petitioner–Appellee and Movant–Appellee.

Merrick, Calvin & Merker, LLP, Glenn W. Merrick, Denver, for Objectors–Appellants.

Opinion by Judge JONES.

In this involuntary liquidation action, the objectors, Law Offices of Bernard J. Hittner Money Sharing Plan and Law Offices of Bernard J. Hittner Profit Sharing Plan (Hittner Plans), appeal an order of the district court approving a plan of distribution and liquidation proposed by Andrew S. Snyder, a receiver for Summit Trust Services, Inc. (Summit). We affirm.

Summit was a trust company initially chartered by the Colorado State Banking Board on February 16, 1993. Summit's original organizers were three California residents, William Cooper, Robert Lindley, and Valerie Jenson, who were also principals in First Pension Corporation, a California pension administrator. As a Colorado chartered trust company, Summit was authorized to perform custodial duties for retirement accounts administered by First Pension, and Summit derived virtually all of its business from First Pension. Prior to chartering Summit, First Pension had used two California banks, Commerce Bank and Monarch, as custodians.

Beginning in September of 1993, Summit performed custodial duties for new customers, registering those new accounts with Summit as custodian of record. Checks made out to Summit as custodian and received by Summit were deposited into a Denver bank account. In January of 1994 Summit undertook custodial responsibilities for existing customers of First Pension whose accounts had been registered previously to the California banks as custodians. However, Summit's accounting records confirmed that there were certain accounts for which Summit had served as the first and only custodian, while other accounts had Summit as the successor custodian to other banks.

On April 21, 1994, the Colorado State Bank Commissioner (Commissioner) took possession of Summit pursuant to § 11–23–122, C.R.S. (1987 Repl.Vol. 4B). Snyder was appointed receiver for Summit on May 2, 1994, *nunc pro tunc* April 21, 1994.

Upon reviewing Summit's records, Snyder promptly determined that Summit had been used as part of a decade-long Ponzi scheme in which early participants were paid from the proceeds of later participants. The fraud was orchestrated through Summit's California affiliate, First Pension, resulting in losses to First Pension's customers exceeding $100 million. Summit itself was custodian for 7,000 customers and management believed its assets to be approximately $350 million. Of those assets, approximately $34 million was in customers' cash awaiting investment, otherwise known as "undirected cash." However, Snyder could locate and gain possession of less than $10 million of this undirected cash. The remainder had been misappropriated in the First Pension fraud schemes.

Subsequent to Summit's closure, the United States Securities and Exchange Commission (SEC) filed an injunctive action in a California federal court for violations of federal securities law by First Pension. The federal court appointed its own receiver (SEC receiver) to recover assets and to draw

up a plan for eventual distribution of assets to all investors defrauded in the Ponzi scheme.

Prior to Snyder's filing of his original plan of distribution and liquidation, the SEC receiver attempted to intervene by asking the state district court here to direct the turnover to the SEC of the entire amount of Summit funds held by Snyder. Subsequently, in order to avoid prolonged and costly litigation, the SEC receiver, Snyder, and the Banking Board ultimately reached a settlement, approved by the state district court and the federal district court in California.

The settlement provided for Snyder to retain approximately $3.6 million of the undirected cash for distribution to those Summit customers whose funds had not been mingled in the larger fraud, and $500,000 for distribution to persons with claims for funds illegally diverted from Summit to another custodian bank by the criminal actions of First Pension's principals. The remaining $5.6 million would be turned over to the SEC receiver for distribution in the California receivership to customers defrauded by First Pension, including those Summit customers who did not receive a distribution from the Summit receivership.

Snyder filed his original plan of distribution and liquidation on June 7, 1995. After the settlement agreement was entered with the SEC receiver, Snyder then filed his first amended plan of distribution and liquidation. A hearing on the plan was held, as to which Summit's customers received notice.

The amended plan's purpose was to provide a means of distributing all of the "undirected cash" held by Snyder that had been formerly held by Summit. In his amended plan, Snyder classified claims against Summit for undirected cash based upon whether the claimants "had Summit as their first and only Custodian." Each claimant for which Summit was the first and only custodian was placed in Class III of the amended plan as an "Original Summit Custodial Client" (OSCC). Class III claims were to be paid a distribution of approximately 96% of the value of the lost funds. Claims for undirected cash which were not Class III claims (including the Hittner Plans' claims) were placed in Class V and would receive no distribution under the amended plan.

The Hittner Plans' filed a timely objection to the amended plan. After a hearing on objections, the district court entered an order approving the amended plan, specifically overruled the Hittner Plans' objections, and denied their motion for reconsideration. This appeal followed.

The Hittner Plans contend that the district court erred in approving this amended plan of distribution and liquidation, proposed by Snyder under the Colorado Trust Company Act, § 11–23–101, et seq., C.R.S. (1987 Repl. Vol. 4B) (Act). We find no error.

The Hittner Plans argue that the amended plan is irrational, discriminatory, confiscatory, and wars with the provisions of the Act. We disagree.

Section 11–23–122(1), C.R.S. (1987 Repl. Vol. 4B) of the Act provides that the Banking Board may take possession of a trust company if:

> after a hearing before the banking board, it finds: The trust company's capital is inadequate; the trust company's business is being conducted in an unlawful and unsound manner; the trust company is unable to continue normal operations; or the control of the trust company has been assumed by any person or persons convicted of fraud or a felony involving moral turpitude or financial dealings in this state or any other jurisdiction, or by any partnership, association, or corporation controlled, directly or indirectly, by any person so convicted....

The Banking Board may also, as here, take immediate possession of a trust company without a prior hearing if the Board finds that "an emergency exists which may result in serious losses to customers...." Section 11–23–122(2)(d), C.R.S. (1996 Cum.Supp.).

■ A trust company is deemed "closed" when it is possessed and its business is closed for the purpose of liquidation. Thereafter, the Board may appoint a liquidator who "shall perform all of the duties required of the [Banking Commissioner] ... and shall make such periodic reports as the banking

board shall require." Section 11–23–122(3), C.R.S. (1996 Cum.Supp.).

Here, Snyder, who was designated by the Board as liquidator, in the action for liquidation that was commenced by the filing of the notice of possession of Summit, was also appointed by the district court as receiver. Section 11–23–122(2)(a), C.R.S. (1996 Cum. Supp.). Thus, those terms shall be used interchangeably here.

Prior to being closed, Summit began to perform custodial services for new customers and became their custodian of record. In January 1994, Summit also began to serve as custodian for existing customers of First Pension whose accounts previously had been registered to other custodial banks associated with First Pension. New funds deposited in these accounts were commingled with funds previously transferred from the predecessor custodial banks.

The consequence of Summit's opening was that it served certain accounts as their first and only custodian, while on other accounts it was the successor custodian. The record reflects that, as to the latter accounts, because of the fraudulent schemes, Summit did not receive the full amount of undirected cash that had been held for those accounts in the predecessor custodial banks and was to have been transferred to Summit as successor custodian.

It was recognition of that circumstance, plus the apparent conversion of undirected cash from accounts transferred to Summit from the predecessor custodial banks, that triggered Summit's initial call to the Colorado Division of Banking on April 18, 1994. Undirected cash in accounts of first and only customers of Summit, however, was not directly affected by the conversion from accounts of transferred accounts, as funds in the accounts of first and only customers could be accounted for at Summit.

Under these circumstances, the amended plan did not violate the provisions of the Act. The plan correctly applied the statutory mandates of § 11–23–124(8)(a), C.R.S.(1987 Repl.Vol.4B) and gave priority to claims in the order as required under this statute. Also, the amended plan was reasonable and rational, and was grounded in the settlement agreement with the SEC receiver so as to provide fairly for distribution of assets under the Act.

Under the Act, a liquidator shall be vested with the full and exclusive power of control, § 11–23–122(1)(b), C.R.S. (1987 Repl.Vol. 4B), and may exercise any power thereof, § 11–23–124(1), C.R.S. (1987 Repl.Vol.4B), including the right to reject any claim if he or she determines the invalidity thereof, § 11–23–124(6)(a), C.R.S. (1987 Repl.Vol. 4B), and the right to determine the amount, if any, owing to each creditor, *and the priority class of its claim under the Act.* Section 11–23–124(6)(b), C.R.S. (1987 Repl.Vol. 4B).

The Act, thus, provides for a broad delegation to the liquidator of the discretionary powers of the Commissioner. Furthermore, in the area of discretionary decisionmaking affecting state chartered banks, our supreme court has stated that it will defer to the expertise of the Commissioner in matters committed to the regulator's discretion by statute. *Banking Board v. Columbine State Bank,* 194 Colo. 54, 569 P.2d 871 (1977); *Goldy v. Henry,* 166 Colo. 401, 443 P.2d 994 (1968).

Snyder appropriately exercised his discretion in drafting his First Amended Plan of Distribution and Liquidation. Snyder's intent under this plan was to best effectuate the purpose of the Act to provide fairly for distribution of assets upon liquidation, and, in our view, this plan has achieved that goal. This plan allowed for distribution from the $3.6 million pool to OSCC customers, whose funds had not been commingled as part of the larger fraud, while at the same time allowing for distribution to non-OSCC customers defrauded by First Pension from the $5.6 million under SEC receivership.

In making such distributions, Snyder was guided in large part by the settlement agreement entered into with the SEC receiver. The settlement agreement provided that the $3.6 million pool would be distributed to OSCC customers while nonOSCC customers would receive their distribution from the $5.6 million pool under SEC receivership in California. Because this $3.6 million pool con-

sisted of funds derived from OSCC customers, whose funds had not been commingled with Ponzi scheme's funds, it was reasonable and appropriate that that pool of funds be reserved for these OSCC customers. Also, it was reasonable and appropriate that the non-OSCC customers, that is, customers whose funds initially were deposited in the California custodial banks prior to their transfer to Summit, and whose funds had been subject to extensive commingling with Ponzi scheme funds, receive their distribution from the California pool of money, including the $5.6 million from Summit.

The reasonableness of this distribution finds further support in the fact that Snyder was faced with the prospect of losing all assets to the SEC receiver. Though entitled to possession of all Summit funds, as part of the settlement agreement between the SEC and Snyder, the SEC receiver took possession of only $5.6 million of undirected cash, leaving a pool of $3.6 million of undirected cash to be distributed by Snyder. The SEC receiver originally sought possession of all Summit assets, but in response to Snyder's skillful negotiations, agreed to this compromise settlement under these terms. Thus, in consideration of this implicit agreement to retain the $3.6 million pool for OSCC customers, Snyder transferred the remaining $5.6 million to the SEC Receiver for distribution in the California litigation, including to non-OSCC customers of Summit.

The funds of customers whose accounts were transferred from predecessor custodian banks and subjected to conversion, along with additional funds they deposited with Summit and commingled with the funds subjected to conversion, reasonably were included within the pool of funds that the SEC receiver will distribute as a part of the California fraud case involving First Pension and its principals. Because the record indicates that the Hittner Plans' accounts were initially with a predecessor custodial bank, it is that pool from which they may eventually recover their claims.

Snyder's amended plan correctly applied the mandates of the Act, and the plan was reasonable and rationally based to further the intent of that Act. Neither the plan itself nor the district court's order approving the plan was arbitrary or capricious, and neither constituted an abuse of discretion. Thus, we will not disturb the Plan on review.

Accordingly, the judgment of the district court is affirmed.

PLANK and RULAND, JJ., concur.